IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-11491
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

EDWARD GABRIEL MCBROWN, also known as Red; FREDRICK
ASBERRY, also known as Andre; FRANK STOLDEN; BOBBY
WAYNE REED, also known as BR, also known as Bobby
Wayne; RODERICK GENE REED, also known as Rod; KEVIN
REED,

                              Defendants-Appellants.


_____

        Appeals from the United States District Court for
               the Northern District of Texas
                     (4:96-CR-68-A)
_____

                      June 22, 1998
Before POLITZ, Chief Judge, REAVLEY and JONES, Circuit Judges.

REAVLEY, Circuit Judge:[*]

    Appellants Bobby Reed, Roderick Reed, Fredrick[1] Asberry,

Edward McBrown, Kevin Reed, and Frank Stolden were convicted on

drug conspiracy and other charges.  They raise numerous points on

_____

    [*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

    [1]  Also spelled "Frederick" in the record.

appeal.  We conclude that the convictions and sentences should stand.

BACKGROUND

The appellants and others were indicted for conspiracy to distribute cocaine and cocaine base (crack cocaine), and for numerous other drug-related and firearm offenses. The government presented evidence that appellants and others were involved in numerous drug transactions in the 1987-1995 time period. Because all defendants were convicted on the conspiracy count and other counts they challenge on appeal, we view the evidence, including all reasonable inferences drawn therefrom and all credibility determinations, in the light most favorable to the verdict,[2] and summarize the evidence here accordingly.

K.M. Sam, a Fort Worth police officer and member of the task force investigating the Bobby Reed organization, testified that appellant Bobby Reed operated Reed's Starter Shop in Fort Worth, and that he also owned the Ebony Terrace Apartments and a club in Crosby, Texas. Sam testified that appellant Roderick Reed, Bobby Reed's brother, lived at a residence on Flamingo Street, and that appellant Stolden lived at a residence on Donalee Street.

J.C. Anderson, a captain with the Tarrant County Sheriff's Department, testified that in 1987, while acting in an undercover role, he and an informant visited Bobby Reed at the starter shop. Reed offered to sell ounce quantities of cocaine for $1800 per ounce. When Anderson returned later that day to make a purchase,

---

[2] *United States v. Resio-Trejo*, 45 F.3d 907, 910-11 (5th Cir. 1995).

3

Reed informed him that he was shutting the cocaine business down for the day because the police were nearby.

Fort Worth police officer Mitchell Felder testified that in 1989 he bought crack cocaine from Willie Collins at the starter shop. Police detective Michael Jones executed a search warrant on the premises the same day. Prior surveillance indicated that persons came and went at the shop without conducting any apparent automotive business. Jones believed that activity was consistent with an illegal narcotics business. Money from Felder's purchase was found in Bobby Reed's pocket. Crack cocaine was found in the shop. Jones also noticed that there were no new or rebuilt starters in the shop.

Larry Jones testified that he purchased crack cocaine from Bobby Reed at that starter shop, in amounts of up to two kilograms. He dealt with Bobby Reed from 1988 through 1992. In 1992 Jones and Reed had a recorded conversation in which Reed quoted Jones a price of $22,000 for a kilogram of cocaine. Jones made purchases from several other people, including Glenn Williams and "Slim." These purchases were arranged through Bobby Reed.

Frank Magee testified that he traveled from Mississippi to the starter shop five to seven times to purchase cocaine for resale. He sent associates on other trips to the starter shop to purchase cocaine. These trips occurred in 1991 and 1992. He dealt with Bobby Reed and Slim at the starter shop.

4

Evangela Asberry, the wife of appellant Fredrick Asberry, testified that in 1993 and 1994 she saw Fredrick purchase and sell crack cocaine. On one occasion Fredrick picked up a one kilogram package of cocaine from Slim. At Bobby Reed's direction, Evangela picked up cocaine in kilogram quantities at Slim's house at least seven times. Bobby Reed would contact Evangela through Fredrick. In January of 1995 Evangela picked up one kilogram of cocaine from Slim and delivered it to Stanley Williams. Williams paid her $18,000 and she delivered the payment to appellant Stolden, at Bobby Reed's instruction. Stolden was at his house on Donalee. Bobby Reed paid Evangela $1000 for the delivery. On another occasion she and Fredrick went to Glen Williams' house and watched Williams "cook" powder cocaine to make crack cocaine. Other testimony linked Glen Williams to Bobby Reed.

In May of 1995, Evangela traveled to Crosby, Texas with appellants Fredrick Asberry and Kevin Reed, Bobby Reed's brother. They went to see Bobby Reed at his club. Appellant McBrown was present. Fredrick picked up money from Bobby Reed at the club. On one occasion Evangela was with Fredrick when he picked up cash from McBrown and delivered it to a house on Hampshire Street.

Evangela Asberry's brother, Darron Reed (no relation to the Reed appellants) testified that he and Evangela were drug dealers. Evangela told Darron she had a drug connection through appellant Fredrick Asberry. In the summer of 1993 Darron told

5

Evangela that he needed a kilogram of cocaine. Darron then spoke to Fredrick, and they arranged to meet at Evangela's nail shop. There Darron paid Fredrick $18,500 and received a kilogram of cocaine. On another occasion Darron purchased two kilograms from Fredrick. Darron bought cocaine directly from Evangela twenty to thirty times, in quantities of one to four kilograms. Evangela told Darron she was getting the cocaine from Bobby Reed.

John Clay testified that in 1993 he met Bobby Reed at the starter shop and expressed an interest in buying cocaine. Reed told him he made about two big buys a year and that he could hook Clay up with Slim. Clay contacted Slim, who was already aware of the price Reed had offered. Clay began buying cocaine from Slim, "Pooh," and Tammy Yarborough, all Reed associates, two to three times a week, in quantities of a quarter kilogram to two kilograms. He also purchased cocaine from appellant McBrown. He testified that he purchased one and two kilogram quantities about fourteen times from McBrown. McBrown told Clay he was getting the cocaine from Houston. Clay also sold three kilograms of cocaine to McBrown.

Michael Mitchell testified that from 1990 to 1992 he purchased cocaine from Eric Richardson, who got his supply from Bobby Reed. In 1993 he began purchasing cocaine from Darrell Sauls, who was linked to Bobby Reed through other evidence. In 1994 he purchased cocaine from Glenn Williams and Roderick Reed. Williams worked for or with Bobby Reed. On one occasion he saw

Williams and Roderick Reed unwrapping a kilogram of cocaine. Mitchell told Officer Sam that he often saw Williams at the starter shop.

Terry Reed, another brother of Evangela Asberry, testified that he worked with Eric Richardson in 1989, and that Richardson got his cocaine from Bobby Reed. Richardson had first met Bobby Reed at the starter shop, where he purchased a kilogram of cocaine. From the end of 1989 until some time in 1992, Richardson would buy two kilograms of cocaine a week from "Tasha" or "Tashon," who worked for Bobby Reed. Richardson bought three kilograms directly from Bobby Reed in 1992. In 1993 Richardson bought three kilograms of cocaine from "Brisha," who worked for Bobby Reed.

Bobby Willie testified that in 1993 and 1994 he bought cocaine from Bobby Reed, Eric Richardson and Evangela Reed (Evangela Asberry after she married appellant Asberry). He bought about twenty-five kilograms from Evangela.

Cedric Clayborne testified that he purchased thirty-one grams of cocaine from appellant Asberry in 1995. He sold the cocaine to Loritha Johnson, a Fort Worth police officer working undercover. Kendra Bagley testified that she began using crack cocaine in 1991. She obtained it from Cedric Clayborne and Darrel Sauls, among others. She also bought crack cocaine for personal use from Roderick Reed, at Reed's Flamingo residence or elsewhere. Evern Charleston testified that he worked for Stanley

Williams in the drug trade, and on one occasion picked up a kilogram of cocaine for Williams from appellant Asberry. On another occasion he picked up two kilograms from Asberry.

Sylvester Jackson testified that in 1995 he traveled to Baytown with appellant McBrown and others to purchase cocaine. They had $140,000 with them. They arrived at a club. McBrown informed Jackson that the seller was Bobby Reed, who was at the club. Jackson saw Evangela Asberry at the club. Jackson and his companions did not pick up the drugs, because according to Jackson the drugs somehow managed to arrive in Fort Worth through other means. Upon returning to Fort Worth Jackson saw two kilograms of cocaine at McBrown's house.

In addition to the conspiracy count (count 1 of the indictment), the appellants were convicted on several other counts. The conspiracy count incorporated by reference each of the other counts as overt acts of the conspiracy. Count 4, against Bobby Reed, concerned a purchase by an undercover agent of 125 grams of cocaine from Bobby Reed and Melonique Lister, his girlfriend, at the Starter Shop on September 7, 1991. Gabreielle Jones testified that on September 7, 1991 she and Melonique Lister went to the starter shop. Bobby Reed gave her the cocaine referenced in count 4. Everett Frye, a Dallas police detective, testified that he went to the starter shop on September 7 to make the undercover buy. Lister went into the shop and retrieved the cocaine, and then gave it to Gabreielle Jones. Jones gave the

cocaine to Frye, who in turn gave Jones $3800. A few days later Frye arranged to purchase three kilograms of cocaine from Lister and Gabreielle Jones. They delivered the cocaine to an agreed location and were arrested. Count 5, against Bobby Reed, alleged that he maintained a building -- the starter shop -- for the purpose of distributing cocaine, in violation of 21 U.S.C. § 856(a)(1).

Counts 8-13 were against appellants Kevin Reed and Frank Stolden. These counts involved drug purchases by informant Frank Tillis. Count 8 alleged a purchase of cocaine from Kevin Reed and Stolden on August 26, 1994. Counts 9 and 13 accused these two of maintaining a residence for purposes of distributing cocaine, in violation of 21 U.S.C. § 856(a)(1). Counts 10 and 11 alleged that Kevin Reed used a telephone in committing and facilitating the August 26 transaction and another transaction, in violation of 21 U.S.C. § 843(b). Count 12 concerned the latter transaction, an undercover purchase of cocaine from Kevin Reed and Stolden on September 23, 1994. Frank Tillis testified that in 1993 or 1994 he first discussed purchasing cocaine from Kevin Reed at the starter shop. The starter shop had changed locations, but Tillis had seen Bobby Reed at the new location. On a later occasion when Tillis wanted to buy cocaine from Kevin Reed, Kevin told him to check with appellant Stolden. On or about August 25, 1994, Tillis went to the starter shop and told Kevin Reed he wanted to purchase 125 grams of cocaine. Kevin

9

Reed later paged Tillis, who then called Reed from the starter shop. Reed told Tillis to go to Stolden's house on Donalee to pick up the drugs. Tillis went to Stolden's house, where Stolden gave Tillis the cocaine and took receipt of $3000. Around September 21, 1994, Tillis called Kevin Reed to purchase another 125 grams of cocaine. The two spoke by phone the next day and Kevin Reed told Tillis to pick up the drugs at Stolden's house. Tillis went to Stolden's house. Stolden and a slender man later arrived. The slender man sold cocaine to a man named "Big Mark," then left and returned with Tillis' cocaine. Tillis paid either Stolden or the slender man $3000 for the cocaine.

Counts 14-16 were against appellant McBrown. At a traffic stop McBrown ran away from Fort Worth police officers after striking one of them. The officers found a handgun and crack cocaine in the car. The counts are for possession with intent to distribute, carrying a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

Counts 21-24 are against appellant Roderick Reed. The counts are for possession of cocaine and cocaine base with intent to distribute, maintaining a residence for purposes of distributing drugs, and possession of a firearm by a felon. A search of Roderick Reed's home on Flamingo yielded crack and powder cocaine, and an assault rifle.

10

In addition to testimony including the testimony of Bobby Reed in his own defense, the defendants offered the testimony of James Jackson, Michael Dixon, and George Gillis, who were inmates in a federal facility along with several prosecution witnesses. Jackson testified that he heard government witness Evern Charleston state that he intended to give false testimony about appellant Asberry. Jackson also heard John Clay state that "he couldn't do no life sentence," and that "anybody that was going to trial that he knowed anything about, he was going to testify against them." According to Jackson, "Mr. Clay said he had to testify against anybody. He was going to testify against anybody that he could to get -- in order to get a reduction in his sentence." Jackson understood that Clay was going to "lie on somebody for no reason just to try to get a reduction in his sentence."

Dixon testified that Darron Reed told him that "it's election year and the government must show the taxpayers what they're doing with their money, so all they're interested in is convictions. You can either roll with them or get rolled over." Bobby Willie told Dixon that all he had to do to "get down" was contact FBI agent Garrett Floyd. Dixon understood "get down" as meaning to "basically lie on someone" to get a reduction in sentence. At one meeting he heard government witnesses Mike Mitchell, Darron Reed, Bobby Willie, Ronnie Bennett, and Evern Charleston indicate that they all wanted to "get down." To

11

Dixon, the government witnesses indicated that they were going to lie for a reduced sentence.

Gillis testified that he heard Evern Charleston say that he was going to frame appellant Asberry because of a dispute over a woman. Gillis heard government witnesses Charleston, Mitchell, and Bennett say that they were going to "get on the bandwagon," which Gillis took to mean that they were going to lie for a reduced sentence.

DISCUSSION

A.  *Sufficiency of Evidence*

Bobby Reed, Roderick Reed, and McBrown raise several sufficiency of evidence points. The jury's verdict will be upheld if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[3]

Roderick Reed challenges his conviction under count 1 for conspiracy.[4] To establish a drug conspiracy in violation of 21 U.S.C. § 846, the government must establish that (1) an agreement existed to violate the narcotics laws, (2) the defendant knew of

---

[3]  *United States v. Walters*, 87 F.3d 663, 667 (5th Cir.), *cert denied*, 117 S. Ct. 498 (1996) .

[4]  Bobby Reed adopts Roderick Reed's brief on this issue, but we have held that an appellant cannot adopt another appellant's argument on a fact-specific challenge such as sufficiency of the evidence. *United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996). In any event the evidence against Bobby Reed on count 1 was overwhelming.

the existence of the agreement, and (3) the defendant voluntarily participated in the conspiracy.[5]

We find the evidence sufficient. There was overwhelming evidence that Bobby Reed, working in concert with Roderick Reed and others, distributed large quantities of cocaine and cocaine base. All the appellants engaged in drug activities linked to Bobby Reed. A rational jury could find the existence of an agreement among the alleged conspirators. Each element of a conspiracy may be inferred from circumstantial evidence.[6] A conspiracy may exist by tacit agreement; an express or explicit agreement is not required.[7] An agreement may be inferred from a concert of action.[8] The evidence, discussed above, amply supports the jury's finding of the existence of a conspiracy.

The evidence also supports the jury's finding of Roderick Reed's participation in the conspiracy. Powder and crack cocaine were recovered at Roderick Reed's residence, along with a triple beam balance scale and large boxes of baking soda. Officer Sam testified that in his experience such a scale and baking soda are

---

[5] *United States v. Garcia*, 86 F.3d 394, 398 (5th Cir. 1996), *cert. denied*, 117 S. Ct. 752 (1997).

[6] *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993).

[7] *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1059 (1998).

[8] *Cardenas*, 9 F.3d at 1157.

associated with the cocaine trade.  Baking soda is used to "cook" cocaine powder into crack cocaine.  He testified that Brenda Ford was part of the Bobby Reed organization, that Ford cooked powder cocaine into crack cocaine for Glenn Williams (linked to the organization by other evidence) and Roderick Reed, and that he had seen Ford and Williams at Roderick Reed's house.  An electricity bill for the Ebony Terrace Apartments, owned by Bobby Reed, was found at the Roderick Reed residence on Flamingo Road.  A piece of paper with Ford's address written on it was found at the house.  An officer involved in the search of the residence testified that papers he perceived to be "dope notes" were found at the Flamingo residence.  Michael Mitchell testified that he bought cocaine from Darrell Sauls, Glenn Williams, and Roderick Reed, who were all linked to Bobby Reed through Mitchell's testimony and other evidence.  Kendra Bagley bought crack cocaine from Roderick Reed, and saw him with Glenn Williams on one of those occasions.

Roderick Reed challenges the credibility of Mitchell, based on the defense testimony of Gillis and Dixon (described above), and challenges the credibility of Bagley based on the Melonique Lister affidavit (described below).  However, we have repeatedly stated that the jury is the final arbiter of the credibility of witnesses.[9]  A guilty verdict may be sustained if supported only

---

[9]  *E.g., United States v. Restrepo*, 994 F.2d 173, 182 (5th Cir. 1993).

14

by the uncorroborated testimony of a coconspirator, even if the witness is interested due to a plea bargain or promise of leniency, unless the testimony is incredible or insubstantial on its face.[10]   Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature.[11]   The testimony of Mitchell and Bagley was not incredible as a matter of law.

Roderick Reed challenges his convictions on counts 21-24 on grounds that there was insufficient proof that he lived at the Flamingo residence.  A rational jury could find that Roderick Reed lived at the Flamingo residence, and that the drugs and firearm were his.  Officer Sam testified that cable service for the residence was in Roderick Reed's name.  Letters to and from Roderick Reed were found at the residence, along with other documents bearing his name.  Bagley testified that she bought cocaine from Roderick Reed at the Flamingo residence.

Bobby Reed challenges the sufficiency of the evidence on counts 4 and 5.  Count 4 concerned the September 7, 1991 purchase of cocaine by an undercover agent at the starter shop.  Gabreielle Jones and detective Frye testified that on September 7, 1991 Jones and Melonique Lister went to the starter shop.

---

[10] *United States v. Gadison*, 8 F.3d 186, 190 (5th Cir. 1993).

[11] *Id.*

Bobby Reed gave Lister the cocaine. Lister delivered the drugs to Jones, who then delivered it to Frye for $3800. We find the evidence sufficient on count 4.

Count 5 alleged that Bobby Reed maintained the starter shop for the purpose of distributing cocaine. Detective Frye made an undercover purchase of cocaine at the starter shop in 1991. Anderson testified that Reed offered to sell him cocaine in 1987 at the starter shop. Felder purchased crack cocaine there in 1989. Michael Jones found the marked bills from this transaction on Bobby Reed's person and crack cocaine in the shop, and testified that prior surveillance indicated that the shop sold illegal narcotics. He also noticed that there were no new or rebuilt starters at the shop. Larry Jones purchased or negotiated to purchase large quantities of cocaine from Bobby Reed at the starter shop. Magee testified that he regularly purchased cocaine from the starter shop. Terry Reed testified that Bobby Reed's drug associate Eric Richardson first met Bobby at the starter shop, and purchased a kilogram of cocaine there. McBrown's state parole records state that he was employed at the starter shop. The evidence is sufficient on count 5.

McBrown challenges his conviction on count 15 for carrying a firearm in relation to a drug offense, in violation of 18 U.S.C. § 924(c)(1). This charge related to the incident, described above, where McBrown was stopped by Fort Worth police officers while driving an automobile, struck one of the officers and fled.

16

The police found a handgun under the front passenger's seat and crack cocaine in the glove compartment.

McBrown argues that there was insufficient evidence linking him to the contents of the vehicle, pointing to evidence that the vehicle was not his.  He also argues that *Bailey v. United States* requires that the defendant "actively employed the firearm during and in relation to the predicate crime."[12]  *Bailey* is inapplicable, since it interpreted the "use" prong of § 924(c)(1).  McBrown was charged and convicted under the "carry" prong of the statute, which applies to one who "during and in relation to [the predicate drug offense] uses or *carries* a firearm . . . ."  Under the "carry" prong of the statute, the Supreme Court has recently held that one carries a firearm by transporting it in an automobile, even where the firearm is located in a locked glove compartment or the trunk of the vehicle.[13]

Further, a rational jury could find beyond a reasonable doubt that the gun was carried "during and in relation to" the drug offense.  The jury was properly instructed that "you must be convinced beyond a reasonable doubt that the firearm played a role in or facilitated the commission of a drug offense.  In

---

[12] 116 S. Ct. 501, 509 (1995).

[13] *Muscarello v. United States*, 1998 WL 292058, at *2 (June 8, 1998).

17

other words, you must find that the firearm was an integral part of the drug offense charged." A rational jury could find that the drugs and the firearm belonged to McBrown, and that he carried the weapon as protection or for some other purpose in relation to his drug dealing. He was the only occupant of the vehicle. He struck a police officer and fled the scene after he was stopped, evidencing knowledge that the vehicle contained contraband. The jury heard extensive evidence of his ties to the drug conspiracy, as described above. In addition to this evidence, the jury heard evidence that in the month following the incident, another Fort Worth police officer pulled McBrown over. As with the prior incident, McBrown was driving without a license and fled the scene, and drugs were found in the passenger compartment.

B. *Variance Between Indictment and Proof*

Roderick and Bobby Reed argue that there was a variance between indictment and proof because there was at most proof of several conspiracies instead of a single conspiracy. In considering whether one or multiple conspiracies exist, "the principal factors are (1) the existence of a common goal, (2) the nature of the scheme and (3) overlapping of participants in the various dealings."[14] "The members of a conspiracy which

---

[14] *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987).

18

functions through a division of labor need not have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy."[15]   Further, a single conspiracy may have several objectives and aim at the commission of several offenses.

> It is for this reason that the government need prove only that a conspirator agreed to one of the many objectives charged to hold him liable for the other objectives of the agreement. . . .   Because one conspiracy may have many illegal objectives, it will necessarily involve a number of sub-agreements to commit each of these specified objectives.  Some members may concur in only some of the many objectives, yet they are liable for all because there is but one scheme, one enterprise, one conspiratorial web.[16]

We are persuaded that the government proved a single conspiracy.  All the appellants were linked to the common goal of obtaining and selling powder and crack cocaine for financial gain.  While the conspiracy may not have been tightly organized, all of the appellants were linked to Bobby Reed, the principal supplier.  All pursued through a division of labor the common objectives of obtaining wholesale quantities of powder and crack cocaine, breaking the shipments into smaller quantities, selling to purchasers for resale and personal use, and avoiding detection.

------

[15] *Id*. at 1154.

[16] *United States v. Rodriguez*, 585 F.2d 1234, 1249-50 (5th Cir. 1978) (citations omitted), *on reh'g en banc*, 612 F.2d 906 (5th Cir. 1980), *aff'd*, 450 U.S. 333 (1981).

Further, a variance between the offense charged in the indictment and the proof relied upon at trial constitutes reversible error only if it affects the substantial rights of the defendant.[17] "We have long held that when the indictment alleges the conspiracy count as a single conspiracy, but the 'government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights.'"[18]  Even if the proof established the existence of multiple conspiracies, such a variance between proof and indictment, standing alone, is not reversible error.

C.  *New Trial Motion*

All six appellants complain that the court abused its discretion in not ordering a new trial on grounds of newly discovered evidence.  Appellants discovered that John Clay, who had testified for the government, had been taken by FBI agent Garrett Floyd to the house Clay shared with his girlfriend

_____

[17] *United States v. Hernandez*, 962 F.2d 1152, 1159 (5th Cir. 1992).

[18] *United States v. Jackson*, 978 F.2d 903, 911 (5th Cir. 1992) (quoting *Richerson*, 833 F.2d at 1155); *see also United States v. L'Hoste*, 609 F.2d 796, 801 (5th Cir. 1980) ("If the Government proves multiple conspiracies and defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights."); *Jolley v. United States*, 232 F.2d 83, 88 (5th Cir. 1956) ("If more than one conspiracy was proved, of at least one of which the appellant was guilty, it is clear that there was no variance affecting his substantial rights.").

20

Latonya Biggins.  This trip occurred several months prior to trial.  Floyd allowed Clay and Biggins to be alone briefly, and the two engaged in a sexual encounter.  At the time, Clay was in federal custody and was cooperating with the government.  Glen Williams, another inmate in federal custody, submitted an affidavit claiming that Floyd had allowed him to have sex with his girlfriend at the federal courthouse.  Appellants also submitted the affidavit of Melonique Lister.  Lister stated that while she was in jail with Raynetta Taylor, an inmate who testified for the government in another case, Floyd had taken Clay and Taylor to dinner and allowed the two to have sex before returning them to jail.[19]

The government submitted the affidavits of Clay, Biggins, Floyd, the prosecutor and others.  Clay and Biggins admitted to the sexual encounter.  However, Floyd and the prosecutor denied knowledge of the encounter until after the trial.  Floyd and Clay stated that the purpose of the trip to the house shared by Clay and Biggins was to obtain information relevant to the investigation of Clay's drug connections, or that the trip had been requested by Clay's attorney.  Floyd denied ever meeting Williams until after the alleged sexual encounter made the

---

[19] Lister also claimed that she heard government witnesses Evangela Asberry, Gabrielle Jones, and Kendra Bagley state that they had given false information or testimony for reduced sentences.

subject of Williams' affidavit.  The government offered another affidavit rebutting the allegations made by Lister.

Appellants contend that the evidence of the sexual encounters constitutes *Brady* material[20] that the government failed to turn over to them prior to trial.  To succeed on a *Brady* claim, the defendant must establish that (1) evidence was suppressed, (2) the evidence was favorable to the defense, and (3) the evidence was material to guilt or punishment.[21]  *Brady* violations require reversal only if there is a reasonable probability that the outcome of the trial would have been different if the evidence had been disclosed to the jury.[22]  A "reasonable probability" is established when the failure to disclose the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[23]

We review *Brady* determinations de novo.[24]  Assuming that the government was aware of the sexual encounters and suppressed this evidence, we conclude after a careful review of the record that

---

[20] *Brady v. Maryland*, 373 U.S. 83 (1963).

[21] *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991).

[22] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

[23] *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

[24] *United States v. Green*, 46 F.3d 461, 464 (5th Cir. 1995).

there is not a reasonable probability that the outcome of the trial would have been different if the evidence concerning the sexual encounters had been disclosed.  Glen Williams did not testify, and the alleged sexual favor he received was not relevant to the trial.  As for Clay, we conclude that even if Floyd knowingly allowed a sexual encounter to take place between Clay and Biggins or Clay and Taylor, we can see no reasonable probability that the such evidence would have affected the outcome of the trial.

Clay was one of many witnesses who testified for the government, and cannot fairly be described as the central or key government witness.  The evidence is sufficient to support the convictions even if Clay's testimony is completely disregarded.  We cannot say what weight the jury gave Clay's testimony, but we know that (1) the jury was aware that Clay was testifying pursuant to a plea bargain and was seeking a reduced sentence for his testimony, (2) Clay admitted on the stand that he was a drug dealer and had prior felony convictions, and (3) the jury had heard from James Jackson, who testified that he had heard Clay say that he was going to lie for a reduced sentence.  We cannot imagine how additional evidence that he was allowed one or two sexual encounters while in custody would have altered the jury's view of his credibility or lack thereof.

Similar allegations arose in *Spence v. Johnson*.[25] The appellant argued that the government had failed to disclose *Brady* material relating to the testimony of a government witness, including the receipt by the witness of "special privileges with his girlfriend while in the McLennan county jail leading up to his testimony."[26] We rejected this claim, noting *inter alia* that the undisclosed evidence was cumulative of other impeaching evidence, and that "no reasonable jury would have believed that [the witness] fabricated his testimony and statements given over the course of two and a half years . . . just to receive a few conjugal visits."[27]

D.   *Denial of Hearing on Motion for New Trial*

Bobby and Kevin Reed, Asberry, McBrown, and Stolden argue that the court erred in denying a hearing on the motion for new trial. Denial of a hearing on a motion for new trial is reviewed for abuse of discretion.[28]

We find no abuse of discretion. The district court had before it the affidavits of Clay, Floyd, Biggins, and others. The evidence is undisputed that Floyd drove Clay to the house

---

[25] 80 F.3d 989 (5th Cir. 1996).

[26] *Id*. at 995.

[27] *Id*. at 995-96.

[28] *United States v. Brewer*, 60 F.3d 1142, 1146 (5th Cir. 1995).

24

Clay shared with Biggins, where Clay and Biggins had a sexual encounter.  Other evidence is in dispute, such as whether Floyd allowed Williams to have a sexual encounter at the courthouse, or allowed Clay to have a sexual encounter with Taylor.  While Floyd swore that he did not know of the encounter between Clay and Biggins until after the trial, appellants argue that with an evidentiary hearing they might have shown otherwise.  They also argue that Floyd's knowledge should be imputed to the government for *Brady* purposes, whether or not the prosecutors knew of the encounter.[29]

However, our conclusion that appellants are not entitled to a new trial turns on none of the disputed issues of fact that appellants claim should have been resolved by evidentiary hearing.  As explained above, we conclude that even if Floyd knowingly allowed Clay to have sex while in custody, on one or both occasions alleged, there is no reasonable probability that such evidence would have changed the outcome of the trial.

E.    *McBrown's Motion to Suppress*

McBrown complains that the district court erred in denying his motion to suppress.  The motion concerned the incident, described above, where McBrown was pulled over by Fort Worth police officers, struck one of the officers, and fled.  The

---

[29] *See United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973).

25

officers discovered a handgun under the front passenger seat and cocaine in the glove compartment. This evidence was the basis of counts 14-16 of the indictment.

McBrown argues that the officers did not have probable cause or reasonable suspicion to stop the vehicle. The evidence, as contained in a police report and later verified at trial by the two officers in question, is undisputed.[30] McBrown was stopped after officer Bach ran the car's license plate through a computer, which showed that there were outstanding arrest warrants on the driver of the vehicle for traffic violations. Officer Bach pulled over the vehicle based on this information. Officer Nesbitt was also on the scene, having arrived in another patrol car. Bach asked McBrown for identification, and was presented with what appeared to be a fictitious identification card. At first McBrown refused to leave the vehicle. After he was asked to sit in the back seat of one of the patrol cars, he struck officer Nesbitt and fled. The vehicle was then searched, and the drugs and firearm were discovered.

---

[30] Since the evidence is undisputed, there is no merit to McBrown's argument that the district court erred in failing to convene a hearing on the motion to suppress.

26

Officers need only reasonable suspicion to make an investigatory stop of a vehicle.[31]  Reasonable suspicion is a considerably less stringent standard than probable cause.[32]

Officer Harris had reasonable suspicion to stop the car because his computer showed that the driver had outstanding arrest warrants.  Reasonable suspicion may be based on personal observation or other information, so long as the information possesses "an indicia of reliability."[33]  We have held that computerized warrant information used by law enforcement officers is sufficiently reliable to meet the even higher probable cause standard,[34] and McBrown does not argue that the computerized data was unreliable.  In *United States v. Tellez*, officer Montoya was told by another officer that a parole violator known to Montoya was driving a black 4 X 4 pickup truck with large tires and a chrome roll bar with attached lights.  Montoya spotted a truck matching this description and pulled it over.  We held that the officer made a proper investigatory stop based on an outstanding warrant for a parole violator who had been seen in a similar

---

[31] *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir. 1993).

[32] *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993).

[33] *Id*. (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)).

[34] *United States v. McDonald*, 606 F.2d 552, 553-54 (5th Cir. 1979).

truck, and that the scope of the investigatory stop extended to ordering the suspect out of the vehicle.[35]  McBrown argues that later evidence showed that he was not the owner of the vehicle, but we fail to see how this fact should alter our conclusion that officer Harris had reasonable suspicion at the time to pull over the vehicle.  He did not know that McBrown was not the owner of the vehicle.

F.  *Denials of Motions for Severance*

Roderick Reed and McBrown complain that the court erred in denying their motions for severance.  Each requested that they be tried separately from all other defendants.

We review the denial of a motion for severance for abuse of discretion.[36]  To demonstrate an abuse of discretion, the defendant "bears the burden of showing specific and compelling prejudice that resulted in an unfair trial,"[37] and such prejudice must be of a type "against which the trial court was unable to afford protection."[38]  We have further noted that "[t]he rule, rather than the exception, is that persons indicted together

---

[35] 11 F.3d at 532-33.

[36] *United States v. Holloway*, 1 F.3d 307, 310 (5th Cir. 1993).

[37] *Id*. at 311.

[38] *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993) (quoting *United States v. Arzola-Amaya*, 867 F.2d 1504, 1516 (5th Cir. 1989).

should be tried together, especially in conspiracy cases," and that "the mere presence of a spillover effect does not ordinarily warrant severance."[39]

There was no abuse of discretion. The district court did order a severance of the defendants into two groups for trial. Only six of the nineteen defendants originally indicted together were tried in the pending case. Roderick Reed and McBrown have not shown compelling prejudice from the joint trial with the other appellants. The court's charge directed the jury to consider the evidence against each defendant on each count separately. Similar instructions have been held sufficient to avoid any possible prejudice from a trial with multiple defendants.[40] We also note that the jury acquitted defendants Bobby Reed, Kevin Reed, and Asberry on five counts, "which supports the inference that the jury considered separately the evidence as to each defendant and each count."[41]

McBrown also argues that the court erred in denying a renewed motion for severance and motion for mistrial after co-defendant Asberry engaged in a verbal outburst during the

_____

[39] *Pofahl*, 990 F.2d at 1456.

[40] *United States v. Faulkner*, 17 F.3d 745, 759 (5th Cir. 1994).

[41] *Id.*

29

testimony of his wife Evangela.[42]  The court instructed the jury to disregard the outburst,[43] and as noted above, its final jury charge gave a standard instruction that the jury should consider the evidence against each defendant on each count separately.  We have held on similar facts that such instructions were sufficient to cure any possible prejudice to the codefendants resulting from the outburst.[44]  We also note that McBrown was the only defendant to move for a mistrial or severance as a result of the outburst, and as the government argues, the outburst may have been more helpful to the defense than the prosecution, since it conveyed, if crudely, Asberry's belief that his wife's testimony was rehearsed and false, and that she was testifying to save herself or her brother from a long sentence.

---

[42] The outburst consisted of the following: "This is rehearsed ass s--t.  That's a f---ing lie.  You understand what I'm saying.  You rehearsed this s--t.  You're a motherf---ing liar.  You motherf---ing liar.  Man, what is this?  She's a bitch.  Y'all set this up, man.  Y'all set this up.  You motherf---ing ho.  Say, you know you got me f---ed up.  This is some rehearsed ass s--t.  S--t.  I don't believe this s--t.  You want your brother out that bad?  You'll f--- me to get out."  On another occasion the court had to warn Asberry to stop making audible noises and facial expressions.

[43] The court instructed the jury: "Sometimes it's hard to put things out of your mind, but I'm going to ask you to do it. Put out of mind what you saw and heard before you were taken out of the courtroom.  Trials are emotional things, and sometimes things happen that shouldn't happen.  I have assurances that it will not happen again, and so I'm going to ask you to completely disregard what happened before you were asked to leave the courtroom."

[44] *United States v. Stotts*, 792 F.2d 1318, 1322 (5th Cir. 1986).

30

G.  *Dismissal of Prospective Juror*

Bobby and Roderick Reed (by adoption), Asberry and McBrown complain that the district court sua sponte dismissed a prospective juror for improper attire.  The prospective juror in question was wearing long shorts, a sleeveless shirt with the shirttail out, and sneakers.  The district court, in responding to post-verdict motions, noted that under 28 U.S.C. § 1866(c)(2), the court may excuse a prospective juror on the ground that "his service as a juror would be likely to disrupt the proceedings." The court also noted that the juror summons received by all prospective jurors plainly instructs: "In keeping with the dignity of the Court, please wear appropriate attire (i.e., men should wear coats and ties; women should wear dresses, suits, or skirts and blouses."  The court concluded that the juror's attire "evidenced disrespect for the court and disregard of the seriousness of the proceedings," and "that the presence of the juror in question would clearly have disrupted the proceedings."

Determinations as to the general qualifications of jurors are reviewed for abuse of discretion.[45]  We find no abuse of discretion.  The prospective juror's attire raised an issue of his understanding of the seriousness of the proceedings, or

---

[45] *United States v. McCord*, 695 F.2d 823, 828 (5th Cir. 1983).

31

alternatively his ability read and follow the simplest of
instructions.

Moreover, there is no basis for a reversal unless appellants
show that the jurors who were chosen to serve were not impartial
or otherwise show that their rights were prejudiced.[46]
Appellants fail to make such a showing.

H.    *Motion for Mistrial*

Bobby and Roderick Reed, Asberry, and McBrown argue that the
district court erred in denying a motion for mistrial on grounds
that a juror had seen some of the defendants escorted in chains
and handcuffs, and told all the other jurors what he had seen.
The district court instructed the jury to disregard the fact that
some defendants were in custody.

Motions for mistrial generally are reviewed for abuse of
discretion.[47]  Likewise, decisions regarding complaints of
outside influence are reviewed for abuse of discretion.[48]  There
was no abuse of discretion.  We have held that brief and
inadvertent exposure to jurors of defendants in handcuffs is not

---

[46] *United States v. Jensen*, 41 F.3d 946, 960 (5th Cir.
1994); *United States v. Prati*, 861 F.2d 82, 87 (5th Cir. 1988).

[47] *United States v. Limones*, 8 F.3d 1004, 1007 (5th Cir.
1993).

[48] *United States v. Sotelo*, 97 F.3d 782, 794 (5th Cir.)
*cert. denied*, 117 S. Ct. 620 (1996).

so prejudicial as to require a mistrial, even when the court gives no cautionary instruction.[49]

I.    *Requested Jury Instruction*

Roderick Reed and Bobby Reed (by adoption) complain that the court erred in denying Roderick and Kevin Reed's requested jury instruction that "[g]uilt of conspiracy cannot be proven solely by familial relationships or by mere knowing presence."

"When reviewing challenges to jury instructions, we take into account the court's charge as a whole and the surrounding context of the trial, including arguments made to the jury."[50] We will reverse only if the requested instruction (1) is substantially correct, (2) was not substantially covered in the charge actually delivered to the jury, and (3) concerns an important point such that failure to give it seriously impaired the defendant's ability to effectively present a given defense.[51]

Appellants have not shown that the district court reversibly erred in refusing the requested instruction. Insofar as the requested instruction states that mere presence will not suffice to prove a conspiracy, the charge given to the jury adequately

---

[49] *United States v. Diecidue*, 603 F.2d 535, 549 (5th Cir. 1979).

[50] *United States v. Flores*, 63 F.3d 1342, 1374 (5th Cir. 1995).

[51] *United States v. Rochester*, 898 F.2d 971, 978 (5th Cir. 1990).

addressed this point.  The jury was instructed that "[m]ere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy."

This leaves the issue of familial relations.  Defendant Bobby, Roderick and Kevin Reed are brothers.  However, the government never argued to the jury that familial relations were sufficient to establish a conspiracy, and a reasonable jury could not infer from the charge given that familial relationships alone can establish a conspiracy, or that such relationships are even relevant to the existence of a conspiracy or membership is such.

J.    *Sentencing Issues*

Roderick Reed and Stolden raise objections to their sentences.[52]  We accept the district court's fact findings regarding sentencing unless they are clearly erroneous.[53]

---

[52] In his brief Bobby Reed purports to adopt Roderick Reed's arguments regarding sentencing.  A defendant may not adopt a co-defendant's arguments on such fact-intensive issues.  *See Alix*, 86 F.3d at 434 n.2.  Bobby Reed's sentence was based on evidence specific to him, regarding the quantity of drugs attributable to him, his role as a leader or organizer, and a finding of obstruction of justice derived from his testimony at trial.  He cannot challenge his sentence by adopting arguments relating to the facts specific to Roderick Reed's sentence.

[53] 18 U.S.C. § 3742(e).

Roderick Reed was sentenced to life under 21 U.S.C. §§ 841 and 851.  Under § 841, a defendant with two prior felony drug convictions shall be sentenced to life if the defendant is convicted of a drug offense involving five or more kilograms of cocaine or fifty or more grams of crack cocaine.  The presentence report found that Reed had two prior state felony drug convictions.  Reed maintained at his sentencing hearing that his guilty pleas in the two state cases were not knowing and voluntary because he was under the influence of cocaine when he pleaded guilty.

The government filed an information stating its intent to rely on the prior convictions for sentencing, pursuant to 21 U.S.C. § 851(a).  Under 21 U.S.C. § 851(c)(2), a defendant challenging the validity of a prior conviction bears the burden of proof on any fact issue bearing on such a challenge.  As to the first guilty plea, Reed testified that he used cocaine the day he pleaded guilty and was under its influence.  He testified that the drug use imposed "some kind of impairment" on him.  Reed's mother also testified that he was addicted to drugs at the time.  As to the second guilty plea, Reed testified that he was in jail perhaps three weeks before pleading guilty.  The court found that Reed was not under the influence of drugs at all when he pleaded guilty in the second case.  As to the first guilty plea, the court found that based on the testimony and the written findings of the state court judgment on the issue of

35

voluntariness, Reed understood the proceedings and made a knowing a voluntary guilty plea. These findings are not clearly erroneous.

Roderick Reed also challenges the findings in the presentence report, adopted by the district court, as to drug quantity, his status as a manager or supervisor, and his possession of a firearm. These arguments are moot, however, since Reed was sentenced to life based on the two prior felony drug convictions. A life sentence is mandated under § 841 if the offense involved fifty or more grams of crack cocaine and the defendant has two prior felony drug convictions. All other issues of drug quantity aside, more than fifty grams of crack cocaine were found at the Flamingo residence alone. The evidence was sufficient that Reed possessed this crack cocaine with intent to distribute, as discussed above.

Stolden objects to the drug quantity used in calculating his sentence. The presentence report found that fifty to 150 kilograms of cocaine were attributable to him. The district court concluded that fifteen to fifty kilograms were attributable to Stolden.

The district court's finding as to drug quantity is a finding of fact and hence reviewable under the clearly erroneous standard.[54] Facts contained in a presentence report are

---

[54] *United States v. Parks*, 924 F.2d 68, 71 (5th Cir. 1991).

considered reliable and may be adopted without further inquiry if they had an adequate evidentiary basis and the defendant fails to present competent rebuttal evidence.[55]  Such rebuttal evidence must demonstrate that the presentence report information is "materially untrue, inaccurate or unreliable."[56]

"Under the Sentencing Guidelines, a defendant who participates in a drug conspiracy is accountable for the quantity of drugs, which is attributable to the conspiracy and reasonably foreseeable to him."[57]  We have held that "an individual dealing in a sizable amount of controlled substances ordinarily would be presumed to recognize that the drug organization with which he deals extends beyond his universe of involvement."[58]  According to Glenn Williams, in a debriefing relied upon in the presentence report, Williams purchased one-half kilogram of cocaine approximately once a week, and picked up the cocaine at Stolden's house or another house.  Stolden would hold five or six kilograms at a time for Bobby Reed.  The presentence report also found that when Roderick Reed was released from prison in 1994, he was often seen at Stolden's house picking up cocaine, as was McBrown.

---

[55] *United States v. Puig-Infante*, 19 F.3d 929, 943 (5th Cir. 1994).

[56] *United States v. Angulo*, 927 F.2d 202, 205 (5th Cir. 1991).

[57] *United States v. Mitchell*, 31 F.3d 271, 277 (5th Cir. 1994) (citing U.S.S.G. § 1B1.3(a)(1)(B)).

[58] *United States v. Thomas*, 963 F.2d 63, 65 (5th Cir. 1992).

Evangela Asberry testified that she delivered the payment for a kilogram of cocaine to Stolden, at Bobby Reed's instructions. Tillis testified that when he told Bobby Reed that he was interested in buying cocaine, Reed told Tillis to contact Stolden. Tillis made two buys at Stolden's house. During one of these buys another man made a half-kilogram purchase at Stolden's house. The district court also found that Stolden was involved in the trip to Crosby where several kilograms of cocaine were purchased for $140,000. During this trip phone calls were made to Crosby from Stolden's house on Donalee, and a Crosby motel receipt was found at the house. Given this evidence, the district court's finding that fifteen to fifty kilograms of cocaine were attributable to Slolden is not clearly erroneous.

Stolden also complains that the district court should have given him a two-point reduction in offense level since he was a minor participant under U.S.S.G. § 3B1.2. Again, given the evidence linking Stolden to the conspiracy on numerous fronts, the district court did not err in failing to make this downward adjustment.

For the foregoing reasons, the convictions and sentences are AFFIRMED.